DONALD W. SEARLES (Cal. Bar No. 135705)
Email: searlesd@sec.gov
KELLY BOWERS (Cal. Bar No. 164007)
Email: bowersk@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> CRAIG ARSENAULT, ATLAS CAPITAL MANAGEMENT, INC., and ACT GLOBAL INVESTMENTS, <br><br> Defendants. | Case No.   8:18-cv-02220 <br><br> **COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)], Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a)], and Sections 209(d), 209(e)(1) and 214 of the

Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 90b-14]. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

2.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)], and Section 214 of the Advisers Act [15 U.S.C. § 90b-14], because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because all of the defendants are inhabitants of and transact business in this district.

## SUMMARY

3.     This matter concerns an ongoing multi-million dollar fraud by defendants Craig Arsenault and the two entities he founded, managed, and controlled – defendants Atlas Capital Management, Inc. ("Atlas") and ACT Global Investments ("ACT"). Atlas is Arsenault's investment advisory firm, and ACT is a company he formed and convinced several of his advisory clients to invest in.

4.     From the outset, Arsenault told his advisory clients that ACT would use their money to make secured short-term loans to doctors. But instead, without the clients' knowledge or consent, ACT made unsecured loans to, for example, a used car dealer, and these loans had little or no prospect of being repaid. Also unbeknownst to his clients, Arsenault forgave all that was due on one of those unsecured loans, as part of an exchange for an interest in undeveloped land in Oceanside, California.

5.     Since 2012 and continuing to the present, Arsenault prepared and sent monthly account statements to the clients invested in ACT, falsely reporting that their investments were generating substantial monthly interest income. In many cases, these monthly account statements caused his advisory clients to reinvest their

reported interest income and to invest even more money in ACT.  In fact, ACT was receiving substantially less interest income than was reported in the monthly statements, and it was unlikely that the reported interest income would ever be collected.

6.  In addition, the defendants misappropriated and misused over $1 million of client funds in ACT.  Instead of investing the clients' funds as he had promised, Arsenault used a substantial portion of client funds to pay himself directly, to lend himself money, to send to Atlas, or to reimburse himself for undocumented ACT expenses.  All of these payments were without the knowledge or consent of his advisory clients.

7.  Most recently, in late October and early November 2018, Arsenault offered two advisory clients who had invested in ACT an interest in a new company that he said owned the undeveloped parcel in Oceanside.  But Arsenault never told them that he had transferred the title to the land to the new company he formed, without the knowledge or consent of the other property owners, thus creating a possible cloud over his company's title to the property.

8.  As a result of their fraudulent and deceptive conduct, Arsenault, Atlas and ACT are violating, and unless enjoined, will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §§ 77q(a)] and Section 10b of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].  In addition, by that same conduct, and by their breaches of their fiduciary duties as investment advisers to their advisory clients, Arsenault and Atlas are violating, and unless enjoined, will continue to violate, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) & 80b-6(2)].

## THE DEFENDANTS

9.  Craig Arsenault, age 49, is a resident of Laguna Niguel, California.  Arsenault is not registered with the SEC in any capacity and holds no securities licenses.

3

10.     Atlas Capital Management, Inc. is a California corporation with its principal place of business in Laguna Niguel, California. It is an investment adviser registered with State of California. Atlas is also a third-party administrator for retirement plans managed by other advisers and custodied at various broker-dealers.

11.     ACT Global Investments is a California corporation with its principal place of business in Laguna Niguel, California. ACT was formed and is solely owned and controlled by Arsenault.

## FACTUAL ALLEGATIONS

12.     As alleged in more detail below, the defendants have defrauded Atlas clients invested in ACT from at least January 2014 to the present.

13.     On June 8, 2018, Arsenault, Atlas and ACT entered into a tolling agreement with the SEC to toll the running of any statute of limitations for any action or proceeding against them, including any sanctions or relief that may be sought or imposed in such action or proceeding, from June 1, 2018 through May 31, 2019.

### A.     The ACT Offering

14.     Atlas is an investment advisory firm that has approximately 165 clients and $25 million in assets under management that are custodied at an SEC-registered broker-dealer. Atlas charges its clients an advisory fee that is a percentage of the assets the clients have under the firm's management. Most of Atlas' profits are distributed to Arsenault.

15.     Arsenault formed ACT in 2012 as an investment vehicle for his advisory clients at Atlas.

16.     Arsenault is a 50% owner and the president of Atlas, and is the 100% owner and president of ACT. Arsenault was principally responsible for advising Atlas' advisory clients on their securities investments, and received most of Atlas' profits.

17.     In soliciting advisory clients to invest in ACT, Arsenault told clients that he would invest their monies in secured short-term bridge loans to doctors. In

particular, he told them the loans were for the acquisition of medical equipment, that ACT would have a security interest in the underlying medical equipment in case a doctor defaulted on the loan, that clients would be paid a return of approximately 1% month, in the form of interest income based on ACT's use of client funds, and that the clients would be repaid their principal and interest within 30 to 60 days of a withdrawal demand.  Arsenault also told clients that he had personally invested his own funds in ACT.

18.    Beginning in November 2012 and continuing to the present, Atlas and Arsenault convinced approximately nine Atlas advisory clients to invest in ACT.  The clients invested in ACT by sending checks payable to ACT to Arsenault's Atlas office, which Arsenault then deposited into ACT's bank account, or by wiring funds directly into ACT's bank account.

19.    As of September 30, 2018, these advisory clients had invested a total of approximately $5.7 million in ACT, and had withdrawn a total of approximately $2.6 million, for a net cash investment of approximately $3.1 million.

20.    The vast majority of the $5.7 million was invested by clients making multiple investments of new monies, from 2015 through March 2018.

21.    Only three clients made just a single investment.  Two of those invested in January 2017.

22.    The other six clients each made two or more investments, including investments in 2015, 2016, 2017, and/or 2018.

23.    The client with the largest investment in ACT, after making his first investments in 2013, invested eight more times from 2014 through 2016, investing $150,000 to $500,000 each time, for a total of approximately $2,725,000.

24.    In addition to the $5.7 million, as of September 30, 2018, advisory clients had reinvested in ACT at least about $1.8 million in interest income that Arsenault represented had been earned on their ACT investments.

25.    Accordingly, as of September 30, 2018, ACT and Arsenault owed the

advisory clients who had invested in ACT at least about $4.9 million.

26.     The clients' investments in ACT constituted securities in the form of investment contracts and/or notes.  The investments are investment contracts because the clients invested money, their funds were pooled in ACT's bank account for the stated purpose of ACT providing financing to other businesses, and their expectation of profits derived solely from Arsenault's and ACT's efforts.

27.     In some cases, Arsenault referred to the investments in ACT as "notes." The investments in ACT can also be considered notes because ACT used the investments to finance its business, and the clients invested in ACT primarily for the profit the investments were expected to return, the ACT investments were sold to numerous advisory clients and were sometimes referred to as "notes," and there is no other regulatory scheme other than the enforcement of the securities laws that reduces the risk of investment.

**B.     False Monthly Reports to Advisory Clients Invested in ACT**

28.     From January 2014 to the present, on approximately a monthly basis, Arsenault, on behalf of ACT, sent monthly account statements to the advisory clients who had invested in ACT.

29.     The monthly account statements would reflect the statement date, the name and address of the holder of the account, the amount of year-to-date deposits and withdrawals, the starting account value and the ending account balance for each month, the interest income for each the month, the amount of interest income that had been reinvested, and the fees charged for the month.  Each account statement was cumulative, in that it reported activity for the current month, as well as for each prior month and year.

30.     Arsenault reviewed and approved the content of all of the monthly account statements sent to the ACT investors.

31.     The monthly account statements were sent from Arsenault's Atlas email address to the advisory clients who invested in ACT.

32.     All of ACT's monthly account statements from January 2014 to the present have been materially misleading.  Although these statements reported interest income of approximately 1% per month on the amount invested, they did not disclose that, since at least 2014, ACT had not, in fact, received a substantial portion of that reported interest income.

33.     The table below sets forth the difference in interest income reported to investors in ACT's monthly account statements and the actual interest income ACT had received during the years in question:

| Year | Actual Interest Income from ACT Investments | Interest Income Reported to Advisory Clients | Percent of Reported Interest Income that ACT Reported To Investors But Had Not Received |
|------|------|------|------|
| 2014 | $0 | $81,705.42 | 100% |
| 2015 | $24,763.68 | $161,153.41 | 84.7% |
| 2016 | $355,288.80 | $453,730.22 | 21.7% |
| 2017 | $400,847.88 | $572,709.34 | 30.0% |
| 2018 | $276,719.40 | $408,589.66 | 32.3% |

34.     In addition to reporting the interest income earned each month, ACT's account statements reported "starting account value," reflecting the value of the account for the preceding month, and the "ending account balance," reflecting the value of the account balance, at the end of the month, based on interest income that that had purportedly been earned and received that month.

35.     The reported ending account balance led the ACT investors to believe that those funds were, in fact, available for withdrawal, within 30 to 60 days, should the client make such a demand.

36.     ACT's monthly account statements had no numerical entry under the column for "fees," thus representing to the clients that no fees or expenses had been charged against their account balances.

37.     None of ACT's monthly account statements sent to the clients between January 2014 and the present reflected the substantial amounts Arsenault, ACT and Atlas had misappropriated and taken for themselves, as alleged in paragraphs 57-65 below.

38.     As such, the monthly account statements provided to the clients invested in ACT, since at least January 2014 to the present, were materially false and misleading, as they falsely made it appear as if: (a) the clients' funds were invested in income-producing investments; (b) that their money was, in fact, earning and receiving interest income in the amounts reported; (c) that their principal and accumulated interest income was secure and available to be withdrawn within 30 to 60 days of a withdrawal demand; and (d) that their money had not been used to pay Arsenault, Atlas or Act.

39.     In addition, ACT's monthly account statements caused many investors to believe that their purported interest income had been reinvested with ACT, when in fact, no new investments were made and no new funds had been lent to existing borrowers.

40.     ACT's monthly accounts statements, reflecting that the investment of client money had generated substantial returns, caused many investors to enter into new securities transactions with ACT, by contributing additional funds to ACT.

41.     For example, one investor, who had invested $321,000 as of March 2013, made substantial investments of new money in ACT, of $250,000 in January 2015, $115,000 in October 2015, $250,000 in June 2016, and $100,000 in June of 2016, based on ACT's monthly account statements showing her investments were earning substantial interest income.  Had that investor known that the interest income reported to her in ACT's monthly account statements were substantially less than the amount reported, she would not have made those additional investments in 2015, 2016, and 2017.

42.     Arsenault knew, or was reckless in not knowing, that ACT's monthly

account statements sent to clients between January 2014 and the present were false and misleading.  He also was negligent and did not exercise reasonable care in ensuring that these monthly statements were materially accurate and not misleading.

43.     Although Arsenault may claim that the monthly account statements simply reflected interest income that had "accrued," rather than interest that had actually been received, the account statements do not reflect that.  The Atlas clients who invested in ACT also did not know that.  Thus, even if it was just accrued income, that was not disclosed to any of the ACT investors.

44.     A reasonable investor in ACT would have found it material and would have wanted to know that the interest income reflected in the monthly account statements for ACT had not actually been received, that the investments were not generating the income reported in the statements, that the principal balances reported in the statements was not secure or readily available for withdrawal, and that Arsenault had misappropriated substantial portions of client funds and the interest income thereon for himself and his firm, Atlas.

45.     As sole owner of ACT and the 50% owner and president of Atlas, Arsenault's conduct, scienter and negligence are properly imputed to those entities.

**C.     Misrepresentations and Omissions about the Use of Client Funds Invested in ACT**

46.     Arsenault commingled advisory client money in one ACT bank account and used portions of it to make four unsecured investments, none of which involved secured short-term bridge loans to doctors.

47.     ACT made unsecured loans totaling about $930,000 to the owner of used car dealerships to finance the dealer's car inventory.  The car dealer made sporadic principal and/or interest payments totaling about $360,000 in 2013 and made no payments from 2014 through 2016.

48.     In 2017, ACT lent an approximately $360,000 in additional funds to the car dealer but received payments totaling only $35,000.  As of January 2018, the car

dealer owed ACT approximately $900,000 plus unpaid interest.

49.    In January 2018, and as alleged in more detail below, Arsenault fully released the car dealer from having to repay ACT on the loan as part of a real estate transaction involving undeveloped land in Oceanside, California.

50.    Second, in 2015 and 2016, ACT made unsecured loans of about $2.7 million to a seller of mobile homes to finance its inventory of homes.  That entity has been paying ACT approximately 1.5% interest per month on the current loan balance (currently, approximately $31,000 per month), and has periodically made some principal payments.  As of October 30, 2018, this loan balance is approximately $2.15 million.

51.    Third, in early 2016, ACT provided Arsenault with $300,000 so he could buy his personal residence.  Arsenault documented this transfer as a supposed unsecured loan that required him to pay 4% interest each year.  However, Arsenault has made no payments on this "loan" at all.  To the extent it was a loan, with accrued 4% interest per year, the loan balance has grown to $330,000.

52.    Fourth, in September 2016, ACT invested in a 16.4 acre parcel of undeveloped real property in Oceanside, California.  Specifically, ACT provided $600,000 to the car dealer referenced above and a third party, to purchase the Oceanside property for $1.26 million.  Although ACT provided almost half the capital for the purchase, the car dealer and the third party were the only ones on the title.

53.    In January 2018, ACT, the car dealer, the other third party, and a law firm entered into a series of agreements where title to the Oceanside property was transferred to a newly created entity, Ocean Palms Villas Land Holding Company, LLC ("OPV").  Under the terms of the transaction, OPV was to be owned by the four parties to the agreements (ACT, the car dealer, the third party and the law firm).

54.    As part of that arrangement, ACT became a 30% owner of OPV and, in exchange, ACT agreed to release the car dealer from all of his debt owed to ACT.

The total amount of debt released was estimated to be about $1.8 million, which consisted of approximately $900,000 principal on the car dealer's loan, unpaid interest on the loan, and $600,000 for the Oceanside property.

55.     Since at least January 2014 to the present, the defendants did not disclose in ACT's monthly account statements, or elsewhere, either orally or in writing, to the Atlas clients who had invested in ACT, that: (a) ACT had made no investments in secured short-term bridge loans to doctors, or any secured loans to any entity; (b) Arsenault had initially made unsecured investments in the used car dealer; (c) he made further unsecured investments in the used car dealer at a time when the car dealer was no longer performing its obligations under the loan; (d) he released all of the car dealer's debt owed to ACT; (e) ACT had invested in undeveloped land in Oceanside, California; and (f) ACT had invested with the dealer of mobile homes. Instead, the monthly account statements merely reported income from the ACT investments.

56.     These misleading and false misrepresentations and omissions were material to the advisory clients who invested in ACT.  Any reasonable Atlas client who had invested in ACT would have wanted to know that ACT had made unsecured loans to a car dealer and a manufacturer of mobile homes, instead of secured loans to doctors, that ACT had lent the car dealer more money even though the car dealer was in arrears on its original loan from ACT, that ACT released the car dealer's debt, and that ACT had invested in undeveloped land.

### D.     Arsenault's Misappropriation and Misuse of ACT Funds

57.     The defendants also misappropriated and misused advisory client money invested in ACT to make various undisclosed payments to Arsenault, Atlas and ACT. This misappropriation and misuse of client money took many forms.

58.     First, Atlas and ACT engaged in a series of roundtrip transactions from approximately December 2014 through October 2017 that left Atlas with, net, about $332,000 of funds invested in ACT by Atlas clients.

59.     The second form of misappropriation took place from June 2013 to as recently as August 2018.  During that time, ACT made payments to Arsenault totaling approximately $190,000.  This includes $19,500 that Arsenault paid himself as recently as August 2018 (as alleged in more detail below).  Arsenault now claims these payments were for reimbursement of ACT expenses and for his compensation.  But the defendants have not provided the SEC with any records that document those expenses or any agreement that reflects Arsenault's alleged compensation.

60.     A third form of misappropriation took place from June 2013 through August 2018.  During that time, ACT also paid for approximately $240,000 of ACT expenses, using the funds the Atlas clients had invested in ACT.

61.     Finally, as alleged above, Arsenault, caused ACT to make a personal "loan" of $300,000 to him in 2016, which he has never paid any interest or principal on.

62.     In total, the defendants misappropriated and misused at approximately $1,050,000 from ACT to benefit Atlas and Arsenault.  All of this money came from money invested by Atlas clients in ACT or from the minimal amount of interest ACT had earned and received, for the benefit of the clients invested in ACT, on its loans and investments.

63.     None of these payments were disclosed to each of the Atlas advisory clients who had invested in ACT.

64.     Any reasonable investor in ACT would have considered the fact that over $1 million of client money invested in ACT had been misappropriated or misused to be material and something they would have wanted to know.

65.     Arsenault knew, or was reckless in not knowing that Atlas client funds had been misappropriated and misused.  He also was negligent and did not exercise reasonable care in ensuring the funds would not be misappropriated or misused, or in ensuring that the clients invested in ACT were made aware of this misappropriation and misuse.

12

**E.     The Defendants' Recent Deceptive Conduct**

    **1.     The new investment in the loan to the mobile home seller**

66.     In March 2018, Arsenault made material misrepresentations and omissions to two existing advisory clients to cause them to invest additional money in ACT.

67.     These two clients had already invested $200,000 in ACT.  In March 2018, Arsenault convinced these two clients to invest another $250,000 by telling them that another advisory client wanted to withdraw his funds from ACT and that their new investment would be used to replace that other client's investment in the loan to the seller of mobile homes.

68.     According to ACT's and the borrower's records, at that time, the seller of mobile homes owed ACT about $2.21 million but ACT owed $2.36 million to the clients whose money had been allegedly allocated to that specific loan.  In other words, ACT's own accounting records showed that it was obligated to pay the advisory clients about $150,000 more than it was owed by the seller of mobile homes.  Thus, the new $250,000 investment Arsenault was asking the two clients to make in this loan could never be repaid from the loan even if the borrower repaid the entire balance.

69.     Arsenault's representations and omissions about this new investment were therefore false and misleading because there were insufficient funds to pay those clients back if they had made the investment.

70.     Such information, had it been disclosed, would have been material to those advisory clients.

71.     Arsenault knew, or was reckless in not knowing, that the representations and omissions he made to the two clients about the new investment were false and misleading.  He was also negligent and did not exercise reasonable care in ensuring that the truth about the investment was fully and accurately disclosed to the two clients.

**2.     The Oceanside property transfer**

72.     On information and belief, in July 2018, Arsenault transferred title of the Oceanside property from OPV to a company he managed and ACT owned, AJF Development Group, LLC ("AJF").

73.     On information and belief, Arsenault transferred the title to AJF without authorization from the other OPV owners.

74.     Arsenault used the property as collateral for AJF to obtain a $1.5 million loan from a hard-money lender.

75.     On information and belief, Arsenault used documents with forged signatures of the other members of OPV to obtain the loan.

76.     AJF received $467,000 of the loan proceeds.  The remaining funds remain in escrow with the lender, or have been used to pay loan fees and expenses.

77.     In August 2018, AJF transferred to ACT $310,000, which (combined with other ACT monies) Arsenault used to pay $270,000 to an ACT advisory client who had demanded a withdrawal.

78.     Arsenault also transferred $19,500 of the loan proceeds from the hard money lender to himself.

79.     In late October 2018, in a verified complaint, other members of OPV sued ACT, Arsenault, AJF, and others, in California state court to quiet title on the Oceanside property, alleging that Arsenault's transfer of the Oceanside property to AJF was not authorized.  That lawsuit seeks to transfer the title back to OPV, to void the lien securing the $1.5 million hard money loan, to expel ACT from OPV, and $5 million in monetary damages.

80.     In addition, in late October and early November 2018, Arsenault made misleading statements to two existing ACT clients in offering them an interest in AFJ (and thus the Oceanside property) if they agreed to amend the terms of their ACT investment.

81.     As alleged above, under the original terms of their ACT investments, the

14

clients were to be paid interest of about 1% each month, and could be repaid in full within 30 to 60 days of a withdrawal request.  In exchange for an interest in AJF, Arsenault asked the clients to agree to change those terms so that their investments would pay 10% per year and the principal and  interest would not be payable until another two years.

82.     The proposed written agreements he sent to the clients he made this proposal to stated that AJF owned the Oceanside property.  His email forwarding those agreements stated that the property had been valued "as is" at $8 million.

83.     When Arsenault presented this deal to the clients, he made material misrepresentations and omissions.

84.     Specifically, at the time Arsenault made the offer to the first client, he had already transferred the property from OPV to AJF without the approval of the other co-owners of OPV.  He did not disclose this to the client.

85.     By the time he made the offer to the second client, Arsenault, AJF and ACT had been sued in the quiet title action, there was a *lis pendens* on the property, and the plaintiffs in that action were seeking $5 million in damages from AJF and ACT, to void the title transfer to AJF as unauthorized, and to expel ACT from OPV, the original owner of the property.  He did not disclose any of this to either client.

86.     Any reasonable investor would have considered this information material and would have wanted to know the truth about AJF's ownership of the property and the manner in which it acquired title, about the quiet title action and the relief sought and obtained in that action, and about the hard-money loan.

87.     Arsenault knew, or was reckless in not knowing that he had not disclosed and had misrepresented to the two clients the full truth about AJF's ownership of the property and the manner in which it acquired title, about the quiet title action and the relief sought and obtained in that action, and about the hard-money loan.  He was also negligent and did not exercise reasonable care in ensuring that the truth was disclosed to these clients.

# FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**(against all Defendants)**

88.   The SEC realleges and incorporates by reference paragraphs 1 through 87 above.

89.   From at least January 2014 to the present, Arsenault, Atlas and ACT made false and misleading misrepresentations and omissions to Atlas clients who invested in ACT by providing monthly account statements to those clients that falsely indicated that their investments in ACT: (a) were invested in income-producing investments; (b) were receiving interest income in the amounts reported in the statements; (c) were secure and available to be withdrawn within 30 to 60 days of a withdrawal demand; and (d) had not been used to pay Arsenault, Atlas and ACT.

90.   In addition, from at least January 2014 to the present, Arsenault, on behalf of Atlas and ACT, made oral misrepresentations and omissions to advisory clients invested in ACT that were materially false and misleading, by falsely representing that their monies would be invested in secured short-term bridge loans to doctors, and by failing to advise each advisory client that their monies had been invested in unsecured loans to car dealerships, a manufacturer of mobile homes, and in undeveloped land in Oceanside, California.

91.   By engaging in the conduct described above, Arsenault, Atlas and ACT, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

92.   By engaging in the conduct described above, Arsenault, Atlas and ACT,

1    and each of them, violated, and unless restrained and enjoined will continue to

2    violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b)

3    thereunder, 17 C.F.R. § 240.10b-5(b).

4                    **SECOND CLAIM FOR RELIEF**

5        **Fraud in Connection with the Purchase or Sale of Securities**

6    **Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

7                        **(against all Defendants)**

8        93.    The SEC realleges and incorporates by reference paragraphs 1 through

9    87 above.

10       94.    Arsenault, acting on behalf of Atlas and ACT, misappropriated and

11   misused, without disclosure to the clients invested in ACT, more than approximately

12   $1 million from ACT to benefit himself and Atlas.

13       95.    By engaging in the conduct described above, Arsenault, Atlas and ACT,

14   and each of them, directly or indirectly, in connection with the purchase or sale of a

15   security, and by the use of means or instrumentalities of interstate commerce, of the

16   mails, or of the facilities of a national securities exchange, with scienter: (a)

17   employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices,

18   or courses of business which operated or would operate as a fraud or deceit upon

19   other persons.

20       96.    By engaging in the conduct described above, Arsenault, Atlas and ACT,

21   and each of them, violated, and unless restrained and enjoined will continue to

22   violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a)

23   and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

24                    **THIRD CLAIM FOR RELIEF**

25            **Fraud in the Offer or Sale of Securities**

26        **Violations of Section 17(a)(2) of the Securities Act**

27                        **(against all Defendants)**

28       97.    The SEC realleges and incorporates by reference paragraphs 1 through

1  87 above.

2      98.    From at least January 2014 to the present, Arsenault, Atlas and ACT

3  obtained money by means of false and misleading misrepresentations and omissions

4  to Atlas clients who invested in ACT by providing monthly account statements to

5  those clients that falsely indicated that their investments in ACT: (a) were invested in

6  income-producing investments; (b) were receiving interest income in the amounts

7  reported in the statements; (c) were secure and available to be withdrawn within 30 to

8  60 days of a withdrawal demand; and (d) had not been used to pay Arsenault, Atlas

9  and ACT.

10      99.    In addition, from at least January 2014 to the present, Arsenault, on

11  behalf of Atlas and ACT, obtained money by means of oral misrepresentations and

12  omissions that Arsenault made, on behalf of ACT and Atlas to advisory clients

13  invested in ACT.  These representations and omissions were materially false and

14  misleading, by falsely representing that their monies would be invested in secured

15  short-term bridge loans to doctors, and by failing to advise each advisory client that

16  their monies had been invested in unsecured loans to car dealerships, a manufacturer

17  of mobile homes, and in undeveloped land in Oceanside, California.

18      100.   By engaging in the conduct described above, Arsenault, Atlas and ACT,

19  and each of them, directly or indirectly, in the offer or sale of securities, and by the

20  use of means or instruments of transportation or communication in interstate

21  commerce or by use of the mails directly or indirectly: obtained money or property by

22  means of untrue statements of a material fact or by omitting to state a material fact

23  necessary in order to make the statements made, in light of the circumstances under

24  which they were made, not misleading.

25      101.   Defendants knowingly or recklessly or negligently, obtained money or

26  property by means of untrue statements of a material fact or by omitting to state a

27  material fact necessary in order to make the statements made, in light of the

28  circumstances under which they were made, not misleading.

102.   By engaging in the conduct described above, Arsenault, Atlas and ACT, and each of them, violated, and unless restrained and enjoined, will continue to violate, Sections 17(a)(2) of the Securities Act, 15 U.S.C. §§ 77q(a)(2).

### FOURTH CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a)(1) & (3) of the Securities Act**

**(against all Defendants)**

103.   The SEC realleges and incorporates by reference paragraphs 1 through 87 above.

104.   Arsenault, acting on behalf of Atlas and ACT, misappropriated and misused, without disclosure to the clients invested in ACT, more than approximately $1 million from ACT to benefit himself and Atlas.

105.   By engaging in the conduct described above, Defendant Arsenault, Atlas and ACT, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

106.   Defendants knowingly or recklessly employed devices, schemes and artifices to defraud; and knowingly, recklessly or negligently, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

107.   By engaging in the conduct described above, Arsenault, Atlas and ACT, and each of them, violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

# FIFTH  CLAIM FOR RELIEF

## Fraud by an Investment Adviser

## Violations of Sections 206(1) and 206(2) of the Advisers Act

## (against Defendants Arsenault and Atlas)

108.   The SEC realleges and incorporates by reference paragraphs 1 through 87 of this Complaint as if fully set forth herein.

109.   Defendants Arsenault and Atlas, at all relevant times, were investment advisers within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11).

110.   Among other things, Arsenault and Atlas made material misstatements and omissions, and breached their fiduciary duties to their advisory clients who had invested in ACT, by: (a) misrepresenting the nature of the investments ACT would make; (b) preparing and distributing monthly account statements to clients invested in ACT that misrepresented the income received on their investments as well as the principal balance available for withdrawal; (c) misappropriating clients funds to benefit Arsenault and Atlas; (d) paying ACT expenses with client funds without disclosing such payments to the advisory clients invested in ACT; (e) failing to disclose to advisory clients invested in ACT, either in their monthly ACT account statements or otherwise, that their funds had been misappropriated and used for unauthorized and undisclosed purposes; and (f) encouraging clients invested in ACT to invest additional monies without disclosing the investments were unlikely to ever be repaid.

111.   In addition, Arsenault and Atlas made material misstatements and omissions, and breached their fiduciary duties to their advisory clients who had invested in ACT, by encouraging them to invest in AJF in exchange for agreeing to amend the terms of their ACT investments, without telling them that Arsenault had fraudulently transferred the Oceanside property from OPV to AJF, without the consent of OPV's co-owners, and that he had encumbered the property with $1.5

million dollar loan, a portion of which he used to pay a withdrawal demand by another advisory client, and to pay himself.

112.   By engaging in the conduct described above, Arsenault and Atlas, and each of them, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce: (a) employed or are employing devices, schemes or artifices to defraud clients or prospective clients; and (b) engaged in or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

113.   By engaging in the conduct described above, Arsenault and Atlas, and each of them, have violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Arsenault, Atlas and ACT , and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### **III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Arsenault and Atlas, and their officers,

agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## IV.

Order Defendants to disgorge all ill-gotten gains received from their illegal conduct, together with prejudgment interest thereon.

## V.

Order Arsenault and Atlas to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 809-9(e)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  December 13, 2018

                              */s/ Donald W. Searles*
                              DONALD W. SEARLES
                              Attorney for Plaintiff
                              Securities and Exchange Commission